# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

DION THOMAS,

       Defendant.

No. 11-CR-2046-LRR

**ORDER**

---

## *TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **RELEVANT PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.   **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . **4**

IV.   **SENTENCING FRAMEWORK** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

V.     **EVIDENTIARY RULES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

VI.   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

     A.    **Section 851 Predicate Offense** . . . . . . . . . . . . . . . . . . . . . . . **9**

     B.    **Guidelines Calculation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

          1.   **Base offense level** . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

               a.   **Applicable law** . . . . . . . . . . . . . . . . . . . . . . . . **13**

               b.   **Heroin** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

               c.   **Crack cocaine** . . . . . . . . . . . . . . . . . . . . . . . . **17**

                   i.    **Sufficient evidence** . . . . . . . . . . . . . . . . . **18**

                   ii.   **Fifth and Sixth Amendment rights** . . . . . . . . . **20**

               d.   **Total drug quantity** . . . . . . . . . . . . . . . . . . . . **22**

          2.   **Role-in-the-offense enhancement** . . . . . . . . . . . . . . . . . . **22**

               a.   **Parties' arguments** . . . . . . . . . . . . . . . . . . . . . **22**

                b.   **Applicable law** . . . . . . . . . . . . . . . . . . . . . . . . **24**

                c.   **Application** . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

          3.   **Criminal history** . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

               a.   **Parties' arguments** . . . . . . . . . . . . . . . . . . . . . **27**

                b.   **Applicable law** . . . . . . . . . . . . . . . . . . . . . . . . **28**

        *c.*       *Application* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *29*

     *4.*     *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *30*

*VII.*  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *31*

## I. INTRODUCTION

The matter before the court is the sentencing of Defendant Dion Thomas.

## II. RELEVANT PROCEDURAL HISTORY

On December 8, 2011, a grand jury returned a six-count Indictment (docket no. 7) against Defendant and five other individuals. Count 1 of the Indictment charged Defendant with conspiring to distribute and possess with the intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin after having been previously convicted of a felony drug crime. Such offense is a violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846 and 851. Count 3 of the Indictment charged Defendant with distributing .54 grams of a mixture or substance containing a detectable amount of heroin after having been previously convicted of a felony drug crime. Such offense is a violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 851. The Indictment also contained a forfeiture allegation. On May 18, 2012, the government filed an Information (docket no. 91) pursuant to 21 U.S.C. § 851, notifying the court and Defendant of the government's intent to seek enhanced penalties against Defendant based on his August 25, 2009 conviction for possession with intent to deliver a controlled substance in the Circuit Court of Cook County, Illinois.

Defendant elected to proceed to trial and, on August 27, 2012, a jury trial on Counts 1 and 3 of the Indictment commenced. *See* August 27, 2012 Minute Entry (docket no. 170). On August 28, 2012, at the close of all of the evidence, Defendant moved for a judgment of acquittal on Counts 1 and 3, which the court denied. *See* August 28, 2012 Minute Entry (docket no. 173). The case was submitted to the jury and, on August 29, 2012, the jury returned guilty verdicts on Counts 1 and 3. *See* Jury Verdicts (docket no. 180). The jury specifically found that Defendant conspired to distribute and possess with

the intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin. *See id.* at 2-3.

On September 12, 2012, Defendant filed a "Motion for a New Trial" (docket no. 186), which the court denied on November 8, 2012. November 8, 2012 Order (docket no. 216) at 9. Meanwhile, the United States Probation Office conducted a presentence investigation. On January 4, 2013, the Presentence Investigation Report ("PSIR") (docket no. 258) was filed. The court ordered briefing on the contested issues. *See* February 27, 2013 Order (docket no. 287).[1] On March 11, 2013, the government filed an Amended Information (docket no. 290), which "correct[ed] the name of [D]efendant's crime of conviction from 'possession with intent to deliver a controlled substance' to 'possession of a controlled substance.'" Amended Information at 2 n.1. That same date, the government filed its Sentencing Memorandum (docket no. 291) and Defendant filed his Sentencing Memorandum (docket no. 292).

On March 25, 2013, the court held a sentencing hearing. *See* March 25, 2013 Minute Entry (docket no. 294). At the sentencing hearing, Defendant offered evidence, which the court received, and the parties argued their positions. The court indicated that it would receive further briefing, issue a written order addressing the contested issues and then reconvene the hearing to impose judgment. On March 29, 2013, the government filed

---

[1] Prior to the court's February 27, 2013 Order, the parties had filed various sentencing memoranda. *See, e.g.*, Government's Sentencing Memorandum (docket no. 265); Defendant's Sentencing Memorandum (docket no. 266); Amendment to Defendant's Sentencing Memorandum (docket no. 267); Defendant's Revised and Substituted Sentencing Memorandum (docket no. 270); Supplement to Government's Sentencing Memorandum (docket no. 285); Supplement to Defendant's Sentencing Memorandum (docket no. 286). In the February 27, 2013 Order, the court struck all of the parties' sentencing memoranda and ordered that each party file one final sentencing memorandum setting forth all of the issues to be argued. *See* February 27, 2013 Order at 1.

its Supplemental Sentencing Memorandum (docket no. 296). That same date, Defendant filed his Supplemental Sentencing Memorandum (docket no. 297).

### III. RELEVANT FACTUAL BACKGROUND

The trial evidence establishes that Defendant lived in Chicago, Illinois, and made frequent trips to Waterloo, Iowa, between approximately 2009 and 2011. In Waterloo, Defendant spent considerable time with his mother's sister, Katina McKenzie-Jackson, and his mother's brother, Essex McKenzie. According to the testimony of cooperating witnesses, Defendant's travel to and from Chicago was for the purpose of transporting heroin and crack cocaine to Waterloo for distribution to a variety of individuals, including Katina McKenzie-Jackson, Essex McKenzie, Arthur Scott (street name "Donta") and others.

Defendant came to the attention of law enforcement as a result of a wiretap on Arthur Scott's phone. During conversations, voice messages and text messages that spanned December 15, 2010, to January 13, 2011, Defendant and Arthur Scott discussed their drug transactions and the money Arthur Scott owed to Defendant from prior drug deals. During their conversations, Defendant and Arthur Scott did not use the word "heroin" but, instead, used code words and phrases. Some of these conversations were recorded while Defendant was incarcerated at the Linn County Correctional Center on unrelated charges. Defendant told Arthur Scott that he was locked up and instructed Arthur Scott to get a money order and give it to Defendant's "Auntie." During another recorded conversation, Defendant told Arthur Scott that his girlfriend, Anita, would be contacting Arthur Scott to give him the address to which he was to send a money order. During that same conversation from the Linn County Correctional Center, Defendant told Arthur Scott to go to Defendant's "Auntie's" house, go to the washroom and then call Defendant. Defendant said he would tell Arthur Scott where the "stuff" was in the washroom. Defendant told Arthur Scott to get in and out of his "Auntie's" house before she discovered

"what's goin' on." In a follow-up phone call, Arthur Scott expressed concern that Defendant's "Auntie" had or would find the "stuff." During Katina McKenzie-Jackson's testimony, she confirmed that Defendant had left heroin in her bathroom closet. During Arthur Scott's testimony, he explained the meanings of the words and phrases used during the recorded conversations.

Katina McKenzie-Jackson and Essex McKenzie lived in apartments on Sherwood Court, across the parking lot from one another. Some of the drug transactions took place in that parking lot, including Lucious Simmons's controlled buy of .54 grams of heroin from Defendant on June 23, 2011. Although law enforcement agents watched the controlled buy from a distance and monitored the transaction through a microphone, the recording device worn by Lucious Simmons was apparently inadvertently turned off during the buy and thus no audio of it was preserved.

Other cooperating individuals, including Katina McKenzie-Jackson and Essex McKenzie, testified to the drug transactions that they engaged in on behalf of or with Defendant. Essex McKenzie knew of Defendant's girlfriend, Anita, who lived in Chicago. Darryl Williams, Arthur Scott's "right-hand man" in the heroin trade, testified that Defendant supplied heroin to Arthur Scott. Lewis Bolden testified that he bought heroin from Katina McKenzie-Jackson, which Katina McKenzie-Jackson stated she had received from Defendant. VonVetta Sawyers testified that he bought heroin from Arthur Scott when Arthur Scott had heroin. At times, VonVetta Sawyers had to wait for the heroin to be delivered to Arthur Scott by or from Defendant. Jamar Jones testified that he bought crack cocaine from Essex McKenzie, which Essex McKenzie stated he had obtained from Defendant. After Defendant and Essex McKenzie had a falling out, Jamar Jones continued to buy crack cocaine either directly from Defendant or through Katina McKenzie-Jackson.

While being detained on the instant federal charges, Defendant confided to Christopher Grover, another federal inmate, that he was being held as a result of a

controlled buy during which he sold an informant .54 grams of heroin. Defendant told Christopher Grover that the audio recorder was not working during the buy. Defendant also stated that he brought 30 to 40 grams of heroin to Waterloo from Chicago to sell and that his aunt and uncle were selling the heroin for him. Defendant told Christopher Grover that, although the agents had monitored his phone calls from the Linn County Correctional Center, the word "heroin" was never spoken during the conversations and, thus, that was going to be his defense.

Defendant cross-examined all of the government's witnesses and elected to present evidence. Katina McKenzie-Jackson's husband, Kevin Jackson, testified that he did not know his wife was involved in heroin distribution, although he thought she might be using drugs. Kevin Jackson denied that their apartment on Sherwood Court was used to store or sell drugs. Debra McKenzie, Defendant's mother, acknowledged that Defendant had a girlfriend named Anita who lived in Chicago. Debra McKenzie attempted to discredit the testimony of her siblings, Katina McKenzie-Jackson and Essex McKenzie, and also attempted to establish that Defendant was in Chicago on June 23, 2011—the date of the controlled buy with Lucious Simmons. According to Debra McKenzie, Defendant was with her in Chicago helping to celebrate her birthday. In passing, Debra McKenzie mentioned that Defendant liked to gamble and frequented a casino in the Waterloo area with Essex McKenzie.

During rebuttal, the government presented evidence through an agent from the Iowa Division of Criminal Investigation as well as Player's Club records from the Isle of Capri Casino suggesting that Defendant was in the Waterloo area at the Isle of Capri Casino and not in Chicago on June 23, 2011.

### IV.  SENTENCING FRAMEWORK

A "district court should begin [a sentencing proceeding] with a correct calculation of the [defendant's] advisory Sentencing Guidelines range." *United States v. Braggs*, 511

F.3d 808, 812 (8th Cir. 2008). A defendant's Guidelines range "is arrived at after determining the appropriate Guidelines range and evaluating whether any traditional Guidelines departures are warranted." *United States v. Washington*, 515 F.3d 861, 865 (8th Cir. 2008).

"[A]fter giving both parties a chance to argue for the sentence they deem appropriate, the court should consider all of the factors listed in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by either party." *Braggs*, 511 F.3d at 812. "The district court may not assume that the Guidelines range is reasonable, but instead 'must make an individualized assessment based on the facts presented.'" *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)); *see, e.g.*, *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.").

The district court "has substantial latitude to determine how much weight to give the various factors under § 3553(a)." *United States v. Ruelas-Mendez*, 556 F.3d 655, 657 (8th Cir. 2009); *see also United States v. Feemster*, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) ("[I]t will be the unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." (quoting *United States v. Gardellini*, 545 F.3d 1089, 1090 (D.C. Cir. 2008)) (internal quotation mark omitted)). "If the court determines that a sentence outside of the Guidelines is called for, it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Braggs*, 511 F.3d at 812 (quoting *Gall*, 552 U.S. at 50). "The sentence chosen should be adequately explained so as 'to allow for meaningful appellate review and to promote the perception of fair sentencing.'" *Id.* (quoting *Gall*, 552 U.S. at 50).

## V. EVIDENTIARY RULES

At a sentencing hearing, the court makes findings of fact using a preponderance of the evidence standard. *See, e.g.*, *United States v. Bah*, 439 F.3d 423, 426 n.1 (8th Cir. 2006) ("[J]udicial fact-finding using a preponderance of the evidence standard is permitted provided that the [Sentencing Guidelines] are applied in an advisory manner."). The court considers a wide variety of evidence, including the undisputed portions of the PSIR, as well as the testimony and other evidence the parties introduced at the sentencing hearing. The court does not "put on blinders" and only consider the evidence directly underlying the offenses of conviction. In calculating a Guidelines range, for example, the court applies the familiar doctrine of relevant conduct. *See* USSG §1B1.3. The Eighth Circuit Court of Appeals has repeatedly held that a district court may consider uncharged, dismissed and even acquitted conduct at sentencing. *See, e.g.*, *United States v. Whiting*, 522 F.3d 845, 850 (8th Cir. 2008). When relevant and "accompanied by sufficient indicia of reliability to support the conclusion that it is probably accurate," the court credits hearsay. *United States v. Sharpfish*, 408 F.3d 507, 511 (8th Cir. 2005). The sentencing judge is afforded great discretion in determining the credibility of witnesses and making findings of fact. *United States v. Bridges*, 569 F.3d 374, 377-78 (8th Cir. 2009).

## VI. ANALYSIS

In his Sentencing Memorandum, Defendant identifies several issues for the court to decide. First, Defendant contends that his August 25, 2009 state-court conviction is not a qualifying predicate offense under 21 U.S.C. § 851 and, consequently, he is not subject to the enhanced penalties, including the ten-year mandatory minimum term of imprisonment, under 21 U.S.C. § 841(b)(1)(B). Second, Defendant objects to the Guidelines calculation in the PSIR, including the base offense level, the upward adjustment for role in the offense and his criminal history category. The court shall address each of Defendant's arguments in turn.

## A. Section 851 Predicate Offense

In his Sentencing Memorandum, Defendant argues that his August 25, 2009 conviction for possession of a controlled substance, specifically, cocaine, "is not a proper predicate[] pursuant to 21 U.S.C. [§] 851." Defendant's Sentencing Memorandum at 2. Specifically, Defendant contends that, because the PSIR writer found that Defendant's distribution of crack cocaine constitutes relevant conduct under USSG §1B1.3 and because "the alleged federal offenses occurred from January 2007 through December 2011 . . . [and] the conduct that gives rise to the [§] 851 conviction occurred in January 2009," Defendant's August 25, 2009 conviction for possession of cocaine is relevant conduct and cannot serve as a predicate offense under 21 U.S.C. § 851. *Id.*

In its Supplemental Sentencing Memorandum, the government argues that Defendant's prior conviction is severable and distinct from the instant offenses and, therefore, is not relevant conduct; however, the government argues that, even if it were relevant conduct, the conviction is nevertheless a qualifying predicate offense under 21 U.S.C. § 851. In support of its argument, the government relies on *United States v. McCarther*, 596 F.3d 438 (8th Cir. 2010), which holds that "prior convictions may be considered for the § 841 enhancements even when the conduct underlying the convictions was part of the conspiracy, so long as an overt act in furtherance of the conspiracy occurred after the date the conviction became final." Government's Supplemental Sentencing Memorandum at 2 (quoting *McCarther*, 596 F.3d at 444) (internal quotation mark omitted). The government contends that, because the trial evidence establishes that Defendant committed acts in furtherance of the conspiracy in 2010 and 2011, whether Defendant's August 25, 2009 offense for possession of a controlled substance is relevant conduct is of no consequence for purposes of the 21 U.S.C. § 841(b) enhancement. Thus, the government maintains that Defendant's prior conviction is a qualifying predicate offense

under 21 U.S.C. § 851 and, therefore, Defendant is subject to the enhanced penalties provided for under 21 U.S.C. § 841(b).

Title 21, United States Code, Section 841(b) provides:

> If any person commits [an offense involving 100 grams or more of a mixture or substance containing a detectable amount of heroin] after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 10 years and not more than life imprisonment . . . , a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18, or $8,000,000 if the defendant is an individual . . . ., or both.

21 U.S.C. § 841(b)(1)(B). Title 21, United States Code, Section 851 sets forth the procedure by which the government must establish that a defendant has a qualifying predicate offense to trigger such enhanced penalties; specifically, the government must file an information. 21 U.S.C. § 851(a). If the defendant "denies any allegation of the information of prior conviction, or claims that any conviction alleged is invalid, he shall file a written response to the information" and "[t]he court shall hold a hearing to determine any issues raised by the response which would except the [defendant] from increased punishment." 21 U.S.C. § 851(c)(1). The government bears the burden of proving beyond a reasonable doubt that the prior conviction is a qualifying offense. *Id.*; *see also United States v. Pratt*, 553 F.3d 1165, 1169 (8th Cir. 2009) (noting that the government bears the burden of proving that a § 851 sentence enhancement applies).

In this case, Defendant does not dispute that he was, in fact, convicted of possession of a controlled substance in the Circuit Court for Cook County, Illinois, on August 25, 2009. Rather, Defendant maintains that such offense cannot serve as the basis for a sentence enhancement because it constitutes relevant conduct to the instant federal offenses. For the reasons set forth in the government's Supplemental Sentencing Memorandum, the court finds that Defendant's argument is without merit. Even if Defendant's August 25,

2009 state-court conviction were relevant conduct—a proposition the court rejects below—it would not necessarily follow that the prior conviction cannot be used as a predicate offense triggering the enhanced penalties under 21 U.S.C. § 841(b). Rather, as the Eighth Circuit stated in *McCarther*:

> [W]here the charged conspiracy began before and continued after a defendant's qualifying felony drug conviction, the felony drug conviction may be considered a 'prior' conviction for purposes of applying the § 841 enhancement so long as the defendant committed an overt act in furtherance of the conspiracy after the date of the conviction.

*McCarther*, 596 F.3d at 443; *see also United States v. Thompson*, 504 F. App'x 512, 513 (7th Cir. 2013) ("[W]hen a defendant continues to conspire after a factually related conviction becomes final, . . . that conviction may nonetheless be used to increase statutory-minimum penalties for the conspiracy offense." (citing *United States v. Alden*, 527 F.3d 653, 663-64 (7th Cir. 2008), and *United States v. Garcia*, 32 F.3d 1017, 1019-20 (7th Cir. 1994)); *United States v. White*, 198 F.3d 252 (Table), No. 98-3975, 1999 WL 758648, at *2-3 (8th Cir. Sept. 24, 1999) (rejecting the defendant's argument that her 1995 conviction for possession of a controlled substance could not support a § 841(b) enhancement for a conspiracy spanning from November 12, 1994, through January 14, 1998, and noting that, "[r]ather than seize the opportunity to cease her criminal activity when she was convicted of possession, [the defendant] continued to be involved in the conspiracy nearly thirty-three months later").

Here, there is overwhelming evidence that Defendant committed acts in furtherance of the conspiracy after his state-court conviction became final on August 25, 2009. In fact, most of the evidence the government presented at trial focused on Defendant's drug-trafficking activities in 2010 and 2011. *See, e.g.*, Testimony of Arthur Scott, Trial Tr. (Vol. I) (docket no. 199) at 19, 37 (noting that he first obtained heroin from Defendant in 2010 and continued to obtain heroin and crack cocaine from Defendant through February

2011); Testimony of Lucious Simmons, Trial Tr. (Vol. I) at 100, 104 (discussing law enforcement's June 23, 2011 controlled buy in which Defendant sold Lucious Simmons heroin). Thus, even if Defendant's state-court conviction were relevant conduct, the prior conviction would nevertheless qualify as a predicate offense under 21 U.S.C. § 851 because there is ample evidence that Defendant committed acts in furtherance of the conspiracy after the state-court conviction became final on August 25, 2009. *See McCarther*, 596 F.3d at 443.

Accordingly, the court finds that Defendant's prior conviction for possession of a controlled substance is a qualifying offense under 21 U.S.C. § 851. Because the jury found Defendant guilty of conspiring to distribute and to possess with the intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin and because Defendant has a qualifying prior felony drug offense, he is subject to the increased penalties under 21 U.S.C. § 841(b)(1)(B), including a ten-year mandatory minimum term of imprisonment.

### B. Guidelines Calculation

Next, Defendant raises a number of objections to the Guidelines calculation in the PSIR, including his base offense level, the 3-level upward adjustment for role in the offense and his criminal history category. The court shall address each objection in turn.

#### 1. Base offense level

First, Defendant contends that the PSIR writer erroneously found Defendant responsible for 769.44 grams of heroin and 1.3181 kilograms of crack cocaine, with a corresponding base offense level of 34. Defendant objects to the PSIR writer's drug-quantity calculation, contending that "there is no evidence that [he] ever sold [crack] cocaine" or distributed more than a fraction of a gram of heroin. PSIR ¶ 4. Moreover, Defendant contends that including the quantity of crack cocaine he allegedly trafficked in calculating his base offense level violates his Fifth and Sixth Amendment rights because he was not charged with, and a jury never convicted him of, a crack cocaine offense.

In its Brief in Support of its Sentencing Memorandum, the government argues that, "[b]ased on the testimony at trial, 673.44 grams of heroin and 1,020.51 grams of [crack] cocaine . . . are attributable to [D]efendant." Brief in Support of Government's Sentencing Memorandum (docket no. 291-1) at 5. The government notes that, although such quantities are less than those the PSIR writer recommended, Defendant is still subject to a base offense level of 34. Moreover, the government contends that the PSIR writer properly found that Defendant's crack cocaine trafficking is relevant conduct and, furthermore, consideration of Defendant's crack cocaine trafficking in determining his base offense level does not violate Defendant's constitutional rights.

### a. Applicable law

"'The government bears the burden of proving drug quantity by a preponderance of the evidence.'" *United States v. Plancarte-Vazquez*, 450 F.3d 848, 852 (8th Cir. 2006) (quoting *United States v. Marshall*, 411 F.3d 891, 894 (8th Cir. 2005)). "'Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.'" *United States v. Young*, 689 F.3d 941, 945 (8th Cir. 2012) (quoting *United States v. Pugh*, 25 F.3d 669, 677 (8th Cir. 1994)); *accord* USSG §2D1.1, comment. (n.5). In other words, "'[t]he court may make a specific numeric determination of quantity based on imprecise evidence.'" *United States v. Sicaros-Quintero*, 557 F.3d 579, 582 (8th Cir. 2009) (quoting *United States v. Roach*, 164 F.3d 403, 413 (8th Cir. 1998)).

In the context of a drug conspiracy, the court "may consider all transactions known or reasonably foreseeable to the defendant that were made in furtherance of the conspiracy." *Plancarte-Vazquez*, 450 F.3d at 852. Moreover, as noted above, "[t]he sentencing court is not prohibited from considering uncharged or acquitted conduct." *Whiting*, 522 F.3d at 850. Thus, the court's drug-quantity calculation "may include [t]ypes and quantities of drugs not specified in the count of conviction if they are relevant

conduct." *United States v. Ault*, 446 F.3d 821, 823 (8th Cir. 2006) (alteration in original) (quoting USSG §2D1.1, comment. (n.5)) (internal quotation marks omitted).

When making its drug-quantity determination, the court may consider any relevant information, "provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG §6A1.3(a). "It is well-established that the testimony of co-conspirators may be sufficiently reliable evidence upon which the court may base its drug quantity calculation for sentencing purposes." *Plancarte-Vazquez*, 450 F.3d at 852; *accord United States v. Walker*, 688 F.3d 416, 421 (8th Cir. 2012) (quoting *United States v. Sarabia-Martinez*, 276 F.3d 447, 450 (8th Cir. 2002)); *see also Young*, 689 F.3d at 945 (noting that the district court may rely on trial testimony to determine drug quantity).

With these general principles in mind, the court now turns to consider the quantities of heroin and crack cocaine that are attributable to Defendant.

### b.    Heroin

The PSIR writer found Defendant responsible for 769.44 grams of heroin. Specifically, the PSIR writer found that Defendant distributed 127 grams of heroin to Arthur Scott; .54 grams of heroin to Lucious Simmons; 624 grams of heroin to Essex McKenzie; 15.5 grams of heroin to Katina McKenzie-Jackson; and 2.4 grams of heroin to VonVetta Sawyers and others.   PSIR ¶¶ 6, 8, 9, 10, 11.   Defendant objects to these quantities, contending that "the available evidence suggests that he only 'exchanged a fraction of a gram of heroin on June 23, 2011.'" *Id.* ¶ 4.   In his Sentencing Memorandum, Defendant specifically objects to the PSIR writer's finding that he distributed 624 grams of heroin to Essex McKenzie.   Defendant argues that the PSIR writer erroneously found that Defendant distributed heroin to Essex McKenzie every week over a two-year period.   For instance, Defendant notes that he was incarcerated for a period in 2011 and, at a minimum, the "quantity should be reduced by the periods of time in which he was incarcerated." Defendant's Sentencing Memorandum at 8.   Moreover, Defendant notes that, in Essex McKenzie's plea agreement, the parties stipulated that Defendant supplied Essex McKenzie

with "'at least 70 grams of heroin.'" *Id.* Defendant "requests that the [c]ourt determine [his] heroin quantity using the agreed to amount in [Essex] McKenzie['s] written plea agreement." *Id.*

In its Brief in Support of its Sentencing Memorandum, the government suggests that Defendant is responsible for 673.44 grams of heroin. The government agrees with Defendant that, with regard to Defendant's distribution of heroin to Essex McKenzie, the court should reduce the total quantity to reflect that Defendant was incarcerated during part of 2011. "Given information obtained from probation regarding [Defendant's] dates of incarceration, the [government] submits the appropriate heroin quantity to attribute to [Defendant] based on his dealings to [Essex] McKenzie is 528 grams. Instead of using 104 weeks as the basis for the heroin determination, this calculation uses 88 weeks." Brief in Support of Government's Sentencing Memorandum at 3 n.5. The government maintains that, with this one slight modification, the PSIR writer correctly calculated the heroin quantity attributable to Defendant.

As an initial matter, contrary to Defendant's assertion that "the available evidence suggests that he only 'exchanged a fraction of a gram of heroin on June 23, 2011,'" PSIR ¶ 4, the court finds that there is overwhelming evidence that Defendant was a major heroin supplier in the Waterloo area and that he regularly distributed heroin, either directly or indirectly, to Arthur Scott, Essex McKenzie, Katina McKenzie-Jackson, VonVetta Sawyers and others. Moreover, based on the credible testimony and evidence presented at trial, the court finds that the PSIR writer correctly found that Defendant distributed: (1) 127 grams of heroin to Arthur Scott, *see* Testimony of Arthur Scott, Trial Tr. (Vol. I) at 20-21; (2) .54 grams of heroin to Lucious Simmons, *see* Testimony of Lucious Simmons, Trial Tr. (Vol. I) at 100, 104; Government Trial Exhibit 6 (docket no. 175-5); (3) 15.5 grams of heroin to Katina McKenzie-Jackson, *see* Testimony of Katina McKenzie-Jackson, Trial Tr. (Vol. II) (docket no. 200) at 188, 190; and (4) 2.4 grams of heroin to VonVetta Sawyers and others, *see* Testimony of VonVetta Sawyers, Trial Tr. (Vol. II) at 224-25.

As the parties acknowledge, however, the more troubling quantity is the amount of heroin Defendant distributed to Essex McKenzie. The PSIR writer found that Defendant distributed 6 grams of heroin to Essex McKenzie every week for an estimated 104 weeks, totaling 624 grams. PSIR ¶ 9. After reviewing the trial transcript, the court finds by a preponderance of the evidence that Defendant distributed 312 grams of heroin to Essex McKenzie, rather than the 624 grams proposed in the PSIR, the 528 grams proposed by the government or the 70 grams proposed by Defendant. Specifically, the court makes the following findings. At trial, Essex McKenzie testified that Defendant began coming to Waterloo "around 2009," Testimony of Essex McKenzie, Trial Tr. (Vol. II) at 159, and that Defendant would generally stay with his aunt, Katina McKenzie-Jackson, when he came to Waterloo. However, Essex McKenzie did not testify to a specific month, or even a season, in 2009 during which Defendant first began coming. Katina McKenzie-Jackson, on the other hand, was able to provide a more specific time frame—that is, she testified that Defendant made his first trip to Waterloo in the summer of 2010. Testimony of Katina McKenzie-Jackson, Trial Tr. (Vol. II) at 186. Moreover, other witnesses testified that they, too, began dealing with Defendant some time in 2010. Thus, without discounting Essex McKenzie's testimony, the court will base its drug-quantity calculation on the conservative estimate that Defendant began distributing heroin to Essex McKenzie in July 2010 and that he continued to do so until December 2011.

The evidence establishes, however, that Defendant did not come to Waterloo *every* week during that eighteen-month period. It is undisputed, for example, that he was incarcerated for part of January 2011, all of February 2011 and part of March 2011. *See* Brief in Support of Government's Sentencing Memorandum at 4 n.6. Furthermore, Arthur Scott characterized his dealings with Defendant as being "off and on," noting that Defendant "would leave and come back, so it . . . wasn't, like, steady. It would be, like, [two] months, and then he would stop for a month, and then probably come back." Testimony of Arthur Scott, Trial Tr. (Vol. I) at 21; *accord id.* at 38. Neither Essex

McKenzie nor Katina McKenzie-Jackson testified that Defendant came only sporadically or that he was not a consistent presence in Waterloo; however, neither Essex McKenzie nor Katina McKenzie-Jackson testified that Defendant came every month. The court notes, for example, that neither Essex McKenzie nor Katina McKenzie-Jackson testified that Defendant did not come to Waterloo to distribute heroin in February 2011, but it is undisputed that Defendant was incarcerated for that entire month. Thus, without discounting the testimony of Essex McKenzie or Katina McKenzie-Jackson, the court conservatively estimates that Defendant came to Waterloo thirteen months, spanning the July 2010 to December 2011 time frame. The court finds that thirteen months is an appropriate estimate given Arthur Scott's testimony, the periods in which Defendant was incarcerated and Government Trial Exhibit 39, which reflects activity on Defendant's Player's Club Card at the Isle of Capri Casino in the Waterloo area. *See* Government Trial Exhibit 39 (docket no. 175-20) (showing activity for January 2011, March 2011, April 2011, May 2011, June 2011, July 2011, September 2011, October 2011 and December 2011, but no activity for February 2011, August 2011 or November 2011).

Turning to the specific quantity that Defendant distributed to Essex McKenzie, the court finds that the trial testimony establishes that Defendant distributed 6 grams of heroin per week to Essex McKenzie. Testimony of Essex McKenzie, Trial Tr. (Vol. II) at 160-61. Thus, assuming four weeks in a month, the court finds that Defendant distributed a total of 312 grams of heroin to Essex McKenzie (13 months x 4 weeks x 6 grams of heroin per week). Combining the quantities Defendant distributed to Arthur Scott (127 grams), Lucious Simmons (.54 grams), Katina McKenzie-Jackson (15.5 grams), VonVetta Sawyers and others (2.4 grams) and Essex McKenzie (312 grams), Defendant is accountable for a total of **457.44 grams of heroin**.

### c. *Crack cocaine*

Defendant also argues that the government has failed to prove by a preponderance of the evidence that he is responsible for 1,318.1 grams of crack cocaine, as found by the

PSIR writer. Moreover, Defendant argues that, inclusion of this crack cocaine quantity in determining his base offense level violates his Fifth and Sixth Amendment rights because his sentence is being driven entirely by uncharged conduct proven by only a preponderance of the evidence.[2] The court shall address each argument in turn.

### i. *Sufficient evidence*

The PSIR writer found Defendant responsible for 1,318.1 grams of crack cocaine. Specifically, the PSIR writer found that Defendant distributed 14 grams of crack cocaine to "Mike"; 1,020.6 grams of crack cocaine to Katina McKenzie-Jackson; and 283.5 grams of crack cocaine to Jamar Jones. PSIR ¶¶ 9, 10, 12. Defendant objects to these quantities, contending that "there is no evidence that [he] ever sold [crack] cocaine." *Id.* ¶ 4. In his Sentencing Memorandum, Defendant further argues that the court should reduce the crack cocaine quantity to reflect the periods in which he was incarcerated.

In its Brief in Support of its Sentencing Memorandum, the government contends that the PSIR writer properly found that Defendant distributed 14 grams of crack cocaine to "Mike" and 283.5 grams of crack cocaine to Jamar Jones. However, the government

---

[2] The court notes that, although Defendant disputes that he trafficked crack cocaine, he does not appear to contest that such conduct, if true, would constitute relevant conduct under USSG §1B1.3. In fact, Defendant's arguments relating to his August 25, 2009 conviction suggest that Defendant agrees that his crack cocaine trafficking activities, if true, are properly considered relevant conduct. *See* Defendant's Sentencing Memorandum at 3-5 (arguing that his August 25, 2009 conviction for possession of a controlled substance—specifically, cocaine—is relevant conduct and, therefore, cannot serve as a predicate offense under 21 U.S.C. § 851 or be used in calculating criminal history points).

To the extent that Defendant is arguing that his crack cocaine trafficking does not constitute relevant conduct under USSG §1B1.3, the court finds that such argument is without merit. The evidence at trial shows that Defendant transported both heroin and crack cocaine from Chicago to Waterloo, at the same time, and distributed both substances to many of the same customers. Given such evidence, the court has no trouble concluding that Defendant's crack cocaine trafficking is relevant conduct. *See* USSG §1B1.3; *see also* USSG §2D1.1, comment. (n.5) ("Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level.").

proposes a more conservative estimate for the crack cocaine Defendant distributed to Katina McKenzie-Jackson. Specifically, the government "suggests using 1.5 ounces of [crack] cocaine . . . per month[, as opposed to the 2 ounces proposed in the PSIR,] for 17 months, excluding February since [D]efendant was in custody that entire month." Brief in Support of Government's Sentencing Memorandum at 4 n.6. Thus, the government maintains that Defendant distributed 723.01 grams of crack cocaine to Katina McKenzie-Jackson, for a combined total of 1,020.51 grams of crack cocaine.

As an initial matter, contrary to Defendant's assertion that there is no evidence that he distributed crack cocaine, the court finds that there is overwhelming evidence that Defendant regularly distributed crack cocaine, either directly or indirectly, to Arthur Scott, Essex McKenzie, Katina McKenzie-Jackson, VonVetta Sawyers and Jamar Jones. Moreover, based on the credible testimony and evidence presented at trial, the court finds that the PSIR writer correctly found that Defendant distributed: (1) 14 grams of crack cocaine to "Mike," *see* Testimony of Essex McKenzie, Trial Tr. (Vol. II) at 163; and (2) 283.5 grams of crack cocaine to Jamar Jones, *see* Testimony of Jamar Jones, Trial Tr. (Vol. II) at 233-34.

As with the amount of heroin Defendant distributed to Essex McKenzie, the amount of crack cocaine Defendant distributed to Katina McKenzie-Jackson is the more troubling calculation. The PSIR writer found that Defendant distributed 1 ounce of crack cocaine to Katina McKenzie-Jackson twice a month for an estimated eighteen months (from approximately July 2010 to December 2011). *See* PSIR ¶ 10. As both parties acknowledge, however, Defendant was incarcerated for a portion of 2011. Moreover, as noted above, Arthur Scott's testimony suggests that Defendant may not have come to Waterloo every month. Thus, consistent with the court's findings above regarding the amount of heroin Defendant distributed to Essex McKenzie and consistent with the government's suggestion of using an estimate of 1.5 ounces of crack cocaine per month, the court finds by a preponderance of the evidence that Defendant distributed 552.89 grams

of crack cocaine to Katina McKenzie-Jackson (13 months x 1.5 ounces, or 42.53 grams). Combining the quantities Defendant distributed to "Mike" (14 grams), Jamar Jones (283.5 grams) and Katina McKenzie-Jackson (552.89 grams), Defendant is accountable for a total of **850.39 grams of crack cocaine**.

### ii.    *Fifth and Sixth Amendment rights*

Next, Defendant argues that, even if there is sufficient evidence that he distributed crack cocaine, inclusion of the amount of crack cocaine he allegedly trafficked in determining the total drug quantity violates his constitutional rights.    Specifically, Defendant notes that he was not indicted with a crack cocaine offense and a jury did not find him guilty of a crack cocaine offense.    Nevertheless, his sentence is being driven almost entirely by the crack cocaine attributed to him.    Defendant contends that, under the unique circumstances of this case, inclusion of this uncharged conduct in determining his base offense level violates his right to an indictment and his right to a jury trial.    Moreover, Defendant argues that he "has a due process right of being convicted with evidence beyond a reasonable doubt.    Yet, in the instant sentencing, . . . [D]efendant will be held accountable for the crack cocaine by a preponderance of [the] evidence."    Defendant's Sentencing Memorandum at 6 (citation omitted).    While Defendant acknowledges that Eighth Circuit precedent "does *not* require more than a preponderance of [the] evidence standard" when determining sentence-enhancing facts, Defendant contends that his case is distinguishable from prior Eighth Circuit cases because his "sentence is driven by conduct unrelated to the heroin trafficking of which [he] was convicted."    *Id.*    Finally, Defendant contends that Eighth Circuit precedent "is not consistent with Supreme Court precedent." *Id.* (citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000)).

The court finds that Defendant's arguments are without merit.    The Eighth Circuit has consistently rejected arguments that a district court's finding of sentencing facts using a preponderance of the evidence standard violates the Fifth and Sixth Amendments.    *See, e.g.*, *United States v. Cruz-Zuniga*, 571 F.3d 721, 726-27 (8th Cir. 2009) (rejecting the

defendant's Fifth and Sixth Amendment arguments where the district court "appl[ied] a two-level sentencing enhancement based on a quantity of drugs . . . that was not charged in the indictment or found by a grand jury"); *United States v. Villareal-Amarillas*, 562 F.3d 892, 895-98 (8th Cir. 2009) (explaining that, post-*Booker*, due process never requires a sentencing court to apply anything more than a preponderance of the evidence standard when making factual findings); *United States v. Davis*, 457 F.3d 817, 825 (8th Cir. 2006) (concluding that "'judicial findings of drug quantity for sentencing purposes do not violate the Sixth Amendment when made under an advisory Guidelines regime'" (citation omitted)); *United States v. Adams*, 451 F.3d 471, 472-73 (8th Cir. 2006) ("'[T]he defendant has no right to a jury determination of the facts that the judge deems relevant,' and so a district court's finding of relevant conduct by a preponderance of the evidence does not offend the Sixth Amendment." (citation omitted) (quoting *United States v. Booker*, 543 U.S. 220, 233 (2005))); *United States v. Garcia-Gonon*, 433 F.3d 587, 593 (8th Cir. 2006) ("This constitutional due process argument fails because 'it is appropriate for a district court to consider uncharged relevant conduct for purposes of sentencing, even if it increases the sentence that would otherwise be applied, so long as the sentence does not exceed the statutory maximum authorized for the charged offense.'" (quoting *United States v. Red Elk*, 368 F.3d 1047, 1051 (8th Cir. 2004), *vacated on other grounds*, 543 U.S. 1106 (2005))); *United States v. Calva*, 979 F.2d 119, 121 (8th Cir. 1992) ("[S]entencing enhancement based on uncharged relevant conduct that is proven by a preponderance of the evidence does not violate constitutional rights to indictment, jury trial, and proof beyond a reasonable doubt."); *United States v. Payne*, 940 F.2d 286, 293 (8th Cir. 1991) (rejecting the defendants' arguments that "their sentences were unconstitutionally imposed because the indictments charged against them failed to specify that cocaine base (crack) would be included in determining the amount of drugs used in calculating their sentences").

In regards to due process challenges, the Eighth Circuit has noted that, while pre-*Booker* Eighth Circuit precedent suggested that due process may require a court to find

sentencing facts using a clear and convincing evidence standard where such facts have a disproportionate effect on the sentence, such an exception did not survive *Booker*. *See Villareal-Amarillas*, 562 F.3d at 895. Rather, given the advisory nature of the Guidelines and the fact that a district court judge may not exceed the statutory maximum, a district court's determination of sentencing facts using a preponderance of the evidence standard never violates due process. *Id.* at 898. "After *Booker*, a due process challenge to findings of fact that impact the defendant's advisory guidelines sentencing range 'is cognizable more properly as a challenge to the reasonableness of his sentence.'" *Id.* (quoting *United States v. Brika*, 487 F.3d 450, 462 (6th Cir. 2007)).

Thus, in light of the foregoing, the court concludes that its finding, by a preponderance of the evidence, that Defendant distributed 850.39 grams of crack cocaine and the inclusion of that quantity in determining Defendant's base offense level does not offend the Fifth or Sixth Amendments. In accordance with *Villareal-Amarillas*, however, the court will take into account Defendant's due process argument in its consideration of the 18 U.S.C. § 3553(a) factors.

### d.    *Total drug quantity*

Consistent with the above, the court finds by a preponderance of the evidence that Defendant is responsible for **457.44 grams of heroin** and **850.39 grams of crack cocaine**. Using the marijuana equivalency table in USSG §2D1.1, the court finds that Defendant is accountable for **3,494.18 kilograms of marijuana**, resulting in a base offense level of 34.[3]

### 2.    *Role-in-the-offense enhancement*

### a.    *Parties' arguments*

The PSIR writer assessed Defendant with a 3-level upward adjustment under USSG §3B1.1(b) for Defendant's role as a manager or supervisor in criminal activity involving

---

[3] The court notes that this is the same base offense level recommended in the PSIR. Thus, although the court finds Defendant is accountable for less drugs than the PSIR writer proposed, Defendant's base offense level does not change.

five or more participants. *See* PSIR ¶ 23. The PSIR writer identified three acts supporting the enhancement: (1) while at the Linn County Correctional Center, Defendant "directed Arthur Scott to send money that [Arthur] Scott owed to . . . [D]efendant for heroin to . . . [D]efendant's girlfriend"; (2) "[D]efendant directed [Arthur] Scott to travel to . . . [D]efendant's aunt's home . . . to retrieve heroin . . . [D]efendant had hidden there"; and (3) "[d]uring the trial, [Lucious] Simmons described Essex McKenzie and Katina McKenzie-Jackson as . . . [D]efendant's 'workers,' who were selling heroin and [crack] cocaine . . . for . . . [D]efendant." *Id.* The PSIR writer also found that the charged conspiracy involved five or more participants, including Katina McKenzie-Jackson, Essex McKenzie, Arthur Scott, Darryl Williams and Defendant.

In his Sentencing Memorandum, Defendant objects to the USSG §3B1.1(b) role-in-the-offense enhancement. Defendant contends that there is no evidence that he managed or supervised anyone. Specifically, he contends that his status as a drug supplier, by itself, cannot support the enhancement; his request that Arthur Scott send money to Defendant's girlfriend was not in furtherance of the conspiracy but, rather, an attempt to get enough money to pay rent; and his request that Arthur Scott retrieve heroin from Defendant's aunt's house does not warrant the enhancement because Arthur Scott did not perform as requested.

In its Brief in Support of its Sentencing Memorandum, the government argues that the PSIR writer properly assessed Defendant with a 3-level upward adjustment for Defendant's role as a manager or supervisor. Specifically, the government contends that the trial evidence shows that Defendant managed both co-conspirators and the criminal activity as a whole. For instance, the government maintains that the trial evidence shows that Essex McKenzie and Katina McKenzie-Jackson were Defendant's workers; Defendant had Essex McKenzie drive him to drug deals and, on occasion, deliver drugs for him; Defendant instructed Arthur Scott to send money that Arthur Scott owed to Defendant to Defendant's girlfriend; and Defendant commented to Lucious Simmons "that he had made a good decision using his aunt's residence as a place from which to sell drugs because of

the limited traffic and access points." Brief in Support of Government's Sentencing Memorandum at 7.

### b. Applicable law

Section 3B1.1(b) provides, "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." USSG §3B1.1(b) (emphasis omitted). The government bears the burden of proving that the §3B1.1(b) enhancement applies. *United States v. Moreno*, 679 F.3d 1003, 1004 (8th Cir. 2012); *see also United States v. Gaines*, 639 F.3d 423, 427 (8th Cir. 2011) ("The government bears the burden of proving by a preponderance of the evidence that the aggravating role enhancement is warranted.").

When determining whether the enhancement is appropriate, the court considers such factors as:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

USSG §3B1.1, comment. (n.4); *see also Gaines*, 639 F.3d at 428 (cautioning that the factors listed in Application Note 4 to USSG §3B1.1 represent a "non-exhaustive list"). The Eighth Circuit has "defined the terms 'manager' and 'supervisor' broadly and [has] held a defendant need only have managed or supervised one other person to qualify for the enhancement. Likewise, the enhancement may apply even if the management or supervisory activity was confined to a single transaction." *United States v. Hoffman*, 707 F.3d 929, 935 (8th Cir. 2013) (citation omitted); *see also United States v. Cole*, 657 F.3d 685, 687 (8th Cir. 2011) (per curiam) ("The terms 'manager' and 'supervisor' are construed broadly under the guidelines." (citing *United States v. Erhart*, 415 F.3d 965, 973 (8th Cir. 2005))).

Despite its broad reading of USSG §3B1.1(b), the Eighth Circuit has cautioned that the enhancement is not appropriate based solely on a defendant's "status as a distributor of narcotics," *Plancarte-Vazquez*, 450 F.3d at 853, or merely because the defendant "fronts" drugs, *Cole*, 657 F.3d at 687. Rather, there must be evidence that the defendant exercised "control over at least one other participant" or exercised "'management responsibility over the property, assets, or activities of [the] criminal organization.'" *Moreno*, 679 F.3d at 1005 (quoting USSG §3B1.1, comment. (n.2)).

   *c.*  *Application*

The court finds that the PSIR writer properly assessed Defendant with a 3-level upward adjustment for his role as a manager or supervisor. First, upon review of the evidence, the court agrees that there were five or more participants in the criminal activity—that is, Katina McKenzie-Jackson, Essex McKenzie, Arthur Scott, Darryl Williams and Defendant.

Second, the court finds that the trial evidence shows that Defendant exercised control over other participants and, furthermore, exercised control over "the property, assets, or activities of [the] criminal organization." *Id.* (quoting USSG §3B1.1, comment. (n.2)) (internal quotation mark omitted). With regard to Defendant's exercise of control over other participants, Lucious Simmons described Essex McKenzie and Katina McKenzie-Jackson as Defendant's "workers," who Defendant used to distribute heroin and crack cocaine. Testimony of Lucious Simmons, Trial Tr. (Vol. II) at 140 (explaining that Defendant "had workers, so he mainly used them to distribute most of his narcotics"); *see also* Testimony of Lucious Simmons, Trial Tr. (Vol. I) at 103 (noting that he was surprised to deal directly with Defendant because Defendant "wants and has other people do his business for him" and "avoid[s] showing his face"). Other trial evidence supports Lucious Simmons's observation. Arthur Scott, for instance, testified that Essex McKenzie and Katina McKenzie-Jackson drove Defendant to drug deals. *See* Testimony of Arthur Scott, Trial Tr. (Vol. I) at 20. Essex McKenzie verified that he drove Defendant to drug deals

and that he delivered drugs on Defendant's behalf. *See* Testimony of Essex McKenzie, Trial Tr. (Vol. II) at 161-63 (noting that he took Defendant to Arthur Scott's house and to "Jerry's" house and that he delivered drugs to "Mike"). Furthermore, Lewis Bolden testified that Katina McKenzie-Jackson obtained heroin from Defendant and that "[s]he would have to get rid of [the heroin Defendant brought] before he would bring her any more." Testimony of Lewis Bolden, Trial Tr. (Vol. II) at 206. Defendant himself admitted that "his aunt and uncle were selling heroin for him." Testimony of Christopher Grover, Trial Tr. (Vol. II) at 252. In light of all of the trial evidence, the court finds that Defendant exercised control over Essex McKenzie and Katina McKenzie-Jackson.

Moreover, the court finds that, on at least one occasion, Defendant exercised control over Arthur Scott. During one of the phone conversations that was recorded while Defendant was at the Linn County Correctional Center, Defendant instructed Arthur Scott to go to Katina McKenzie-Jackson's house to retrieve heroin that Defendant had stored there. *See* Testimony of Arthur Scott, Trial Tr. (Vol. I) at 32. Although Defendant suggests in his Sentencing Memorandum that Arthur Scott did not in fact retrieve the heroin as instructed, Arthur Scott testified at trial that he did not retrieve the heroin because Defendant had "changed his mind." *Id.* at 58.

In addition to exercising control over individual participants, the court agrees with the government that Defendant exercised control over the criminal activity as a whole. For instance, the trial evidence shows that Defendant made decisions regarding: (1) who was permitted to participate, *see* Testimony of Jamar Jones, Trial Tr. (Vol. II) at 232 (noting that, while he previously did business with Essex McKenzie, Defendant and Essex McKenzie "had a falling out" and he "got word from [Katina McKenzie-Jackson] . . . that [he] would probably be dealing more with [Defendant] than with Essex [McKenzie]"); (2) where the criminal activity took place, *see* Testimony of Lucious Simmons, Trial Tr. (Vol. I) at 106 (describing a conversation with Defendant in which Defendant stated that he "couldn't have picked a better spot to sell [his] product"); and (3) when the criminal

activity took place, *see* Testimony of Jamar Jones, Trial Tr. (Vol. II) at 233-34 (stating that Defendant would let him know which day Defendant would deliver the crack cocaine but that Defendant would not specify a time and would "just pop up").

Thus, in light of the foregoing, the court finds that the PSIR writer properly assessed Defendant with a 3-level upward adjustment for Defendant's role as a manager or supervisor.

### 3.     Criminal history

#### a.     Parties' arguments

Next, Defendant objects to the PSIR writer's assessment of criminal history points for his August 25, 2009 conviction for possession of a controlled substance. *See* PSIR ¶ 32 (assessing Defendant with 2 criminal history points for the conviction); *id.* ¶ 35 (assessing Defendant with 2 criminal history points because Defendant committed the instant offenses while under a criminal justice sentence).  The August 25, 2009 conviction arose out of a January 2009 traffic stop in Cook County, Illinois.  *Id.* ¶ 32.  During the course of the traffic stop, law enforcement officers discovered "'numerous small off white rock like chunks of suspected cocaine" and suspected marijuana in the car and recovered $12,015 in United States currency from Defendant's person.  *Id.*  Defendant was subsequently charged and convicted of possession of a controlled substance.  *Id.*

In his Supplemental Sentencing Memorandum, Defendant maintains that the conduct underlying the August 25, 2009 conviction constitutes relevant conduct under USSG §1B1.3 and, consequently, such prior conviction cannot be included in the calculation of his criminal history category.  Relying on *United States v. Weiland*, 284 F.3d 878 (8th Cir. 2002), Defendant contends that his prior conviction constitutes relevant conduct because the conduct underlying the prior conviction took place during the same time period as the conspiracy charged in this case; the conduct underlying the prior conviction occurred in the same geographic area as the conduct alleged in this case; the prior conviction involved cocaine, which is one of the substances Defendant allegedly transported from Chicago to

Waterloo in connection with the instant case; the conduct underlying the prior conviction involved "indicia of drug trafficking," as evidenced by the large amount of United States currency found on Defendant's person; the government previously argued that Defendant's "Chicago cocaine trafficking activity was relevant to the instant heroin offense"; the prior conviction and the instant offenses have "'society' as a common victim"; and, finally, the evidence shows that the prior conviction and instant offenses were part of a "common scheme" in which Defendant transported drugs from Chicago to Waterloo. Defendant's Supplemental Sentencing Memorandum at 4-6.

In its Supplemental Sentencing Memorandum, the government contends that Defendant's August 25, 2009 conviction is a severable and distinct offense and, therefore, the PSIR writer properly included it in the calculation of Defendant's criminal history category. Specifically, the government argues that the August 25, 2009 conviction is temporally distinct because the conduct underlying the conviction occurred in January 2009 and, although the Indictment in the instant case alleges that the charged conspiracy began in 2007, the evidence at trial shows that Defendant did not join the conspiracy until later in 2009. Moreover, the government argues that the offenses are geographically distinct and not part of a common scheme because the conduct underlying the prior conviction took place in Chicago, not Waterloo, and "there is nothing about the [prior] conviction that indicates [Defendant] was bringing the cocaine to Waterloo when caught." Government's Supplemental Sentencing Memorandum at 4. Finally, the government notes that it did not use Defendant's prior conviction at trial to prove the instant offenses.

### b. *Applicable law*

"Under [USSG §4A1.1], a defendant is assigned criminal history points for each prior sentence to which he was subject . . . ." *United States v. Chibukhchyan*, 491 F.3d 722, 725 (8th Cir. 2007). Pursuant to USSG §4A1.2(a)(1), "[t]he term 'prior sentence' means any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendere*, for conduct not part of the instant offense." USSG

§4A1.2(a)(1). Thus, if a prior conviction "is part of the [charged] offense, it is . . . treated as relevant conduct and is considered in the calculation of the defendant's offense level, not criminal history category." *United States v. Phelps*, 536 F.3d 862, 868 (8th Cir. 2008); *accord Chibukhchyan*, 491 F.3d at 725.

The Eighth Circuit has instructed that, when determining whether a prior conviction is relevant conduct under USSG §1B1.3, a court should consider whether the prior conviction and charged offense are "severable and distinct," taking into account such factors as "temporal and geographical proximity, common victims, common scheme, charge in the indictment, and whether the prior conviction is used to prove the instant offense." *Phelps*, 536 F.3d at 868 (quoting *United States v. Stone*, 325 F.3d 1030, 1032 (8th Cir. 2003)) (internal quotation mark omitted); *accord United States v. Hernandez*, 712 F.3d 407, 409 (8th Cir. 2013); *Chibukhchyan*, 491 F.3d at 725. "Whether a conviction was relevant conduct involves a fact intensive inquiry . . . ." *Phelps*, 536 F.3d at 868 (quoting *Stone*, 325 F.3d at 1031) (internal quotation mark omitted); *accord Hernandez*, 712 F.3d at 409.

### c.      *Application*

In this case, after applying the factors that the Eighth Circuit identified in *Phelps*, the court agrees with the government that Defendant's August 25, 2009 conviction is severable and distinct from the charged offenses. First, the court finds that the offenses are temporally distinct. The conduct underlying the August 25, 2009 conviction took place in January 2009. Although Defendant notes that Count 1 of the Indictment in the instant case charges that the conspiracy began in 2007, there was no evidence at trial that Defendant joined the conspiracy at its conception. Rather, the evidence at trial suggests that Defendant joined the conspiracy, at the earliest, sometime in August 2009. *See* Testimony of Essex McKenzie, Trial Tr. (Vol. II) at 159 (noting that Defendant began coming to Waterloo "around 2009" and would generally stay with Katina McKenzie-Jackson when he visited); Testimony of Katina McKenzie-Jackson, Trial Tr. (Vol. II) at 185 (noting that she moved

to Waterloo in August 2009). Thus, the conduct underlying the August 25, 2009 conviction took place approximately six months before Defendant joined the charged conspiracy.

Second, the court agrees with the government that there is no evidence that the prior conviction and the charged offenses were part of a common scheme or were otherwise related. Although Defendant suggests that law enforcement's discovery of a large amount of United States currency on Defendant's person during the January 2009 traffic stop is "indicia of drug trafficking," Defendant's Supplemental Sentencing Memorandum at 5, there is no basis from which the court can conclude that Defendant was transporting the cocaine discovered during the traffic stop to Waterloo.

Third, and perhaps most significant, the Indictment in the instant case did not charge Defendant with the conduct underlying the August 25, 2009 conviction and the government did not use the August 25, 2009 conviction to prove the instant offenses—that is, the government did not offer any evidence regarding Defendant's August 25, 2009 conviction at trial. *See Hernandez*, 712 F.3d at 409 ("We have repeatedly affirmed district court findings that prior drug possession offenses were 'separate and distinct' when the conduct underlying the prior conviction was neither alleged in the subsequent indictment nor used to prove the offense of conviction.").

Thus, for the reasons more fully set forth in the government's Supplemental Sentencing Memorandum, the court finds that Defendant's August 25, 2009 prior conviction is severable and distinct from the instant offenses. Accordingly, it is a "prior sentence" within the meaning of USSG §4A1.2(a)(1) and properly included in calculating Defendant's criminal history category. The court, therefore, finds that the PSIR writer correctly assessed Defendant with 2 criminal history points for his August 25, 2009 conviction and 2 criminal history points for committing the instant offenses while on parole.

### 4.   *Summary*

In light of the foregoing, the court finds that Defendant's base offense level is 34. Defendant is subject to a 3-level upward adjustment for his role as a manager or supervisor.

There are no other applicable adjustments and, thus, Defendant's total offense level is 37. With a criminal history category of IV, Defendant's advisory Guidelines range is 292 to 365 months.

## VII.  CONCLUSION

When the sentencing hearing resumes on July 16, 2013, at 2:15 p.m., the court shall make findings consistent with this Order.  The court shall then hear any final arguments from the attorneys regarding Defendant's motion for a downward variance and afford Defendant an opportunity to address the court.  The court shall then make additional findings relating to Defendant's motion for a downward variance before imposing judgment.

**IT IS SO ORDERED.**

**DATED** this 9th day of July, 2013.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA